IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

JOHN R. HARRISON,                       )
                                        )
                Plaintiff,              )
                                        )
        v.                              )        1:22-cv-1298 (LMB/JFA)
                                        )
FRANK KENDALL III, Secretary of the Air )
        Force                           )
                                        )
                Defendant.              )

## MEMORANDUM OPINION

Before the Court is Plaintiff's Motion for Summary Judgment [Dkt. No. 43] and

Defendant's Motion to Dismiss, or in the Alternative, for Summary Judgment [Dkt. No. 46].  For

the reasons stated in open court and as further explained in this Memorandum Opinion,

Plaintiff's Motion for Summary Judgment was granted, Defendant's Motion to Dismiss, or in the

Alternative, for Summary Judgment was denied, and the Air Force Board for Correction of

Military Records' ("AFBCMR") September 2019 decision was remanded for reconsideration.[1]

## I. BACKGROUND

Plaintiff John R. Harrison ("Harrison" or "plaintiff") filed this civil action for declaratory

and injunctive relief against the Secretary of the Air Force, Frank Kendall III ("defendant"), to

challenge the AFBCMR's September 2019 decision denying his application to correct his

disability retirement rating from 50% to 100% retroactive to 1978, when he retired from the

---

[1] The Court's Order entered on April 7, 2023 remanded but failed to vacate the AFBCMR's
September 2019 decision.  [Dkt. No. 55].  Accordingly, an Amended Order will be issued with
the Memorandum Opinion vacating and remanding the AFBCMR's September 2019 decision.

United States Air Force ("Air Force"), on the basis of post-traumatic stress disorder ("PTSD") resulting from his service in Vietnam and a military plane crash in 1976.

### A. **Statutory and Regulatory Background**

A service member ordinarily must serve 20 years to retire from the Air Force with retirement benefits, but pursuant to 10 U.S.C. § 1201, the Secretary of the Air Force may grant early retirement with retired pay to a service member who is determined to be "unfit to perform the duties of the member's office, grade, rank, or rating because of physical disability incurred while entitled to basic pay[.]" 10 U.S.C. § 1201(a). Among other requirements, the disability must be "at least 30 percent under the standard schedule of rating disabilities in use by the Department of Veterans Affairs at the time of the determination" and, as relevant here, "the proximate result of performing active duty[.]" Id. § 1201(b).

The Air Force's Physical Evaluation Board determines the fitness of service members. The Air Force Manual in effect at the time of Harrison's fitness evaluation provided that "[a] member is unit [sic] because of physical disability when [the] member is clearly unable to perform the duties of his or her office, grade, or rank, in such a manner as to reasonably fulfill the purpose of [the] member's employment on active duty." Air Force Manual 35-4, ¶ 3-26(c) (Apr. 12, 1976). The Air Force Manual defined a physical disability as "any manifest or latent impairment due to disease or injury, regardless of degree, which reduces or precludes an individual's actual or presumed ability to engage in gainful or normal activity," including "mental disease but not such inherent defects as behavior disorders, personality disorders, and primary mental deficiency." Id. ¶ 3-26(d). Although "[t]he mere presence of defects is not sufficient to justify a finding of unfitness," "the aggregate effect of all defects present must be considered both from the standpoint of the effect on the member's performance, and requirements which may be imposed on the Service concerned to maintain and protect [the]

2

member during future duty assignments." Id. ¶ 3-26(c).  Once a member has been determined to

be unfit because of physical disability, the Physical Evaluation Board is responsible for

identifying, categorizing, and assigning a percentage rating for each ratable condition or defect in

accordance with the Veterans Administration Schedule for Rating Disabilities.  Id. ¶¶ 3-26(e), 3-

27.  The Physical Evaluation Board then determines whether a service member is entitled to

disability benefits, which are based on the combined percentages of all listed compensable

defects.  Id. ¶ 3-34; see 10 U.S.C. § 1401 (detailing computation of disability retired pay).

        Under 10 U.S.C. § 1552, the secretaries of the military departments, including the Air

Force, are authorized to correct a military record "when the Secretary considers it necessary to

correct an error or remove an injustice."  Id. § 1552(a)(1).  These determinations are to be "made

by the Secretary acting through boards of civilians of the executive part of that military

department."  Id.  A request for correction must be filed within three years of the discovery of the

error or injustice; however, the board may excuse a failure to file within this period "if it finds it

to be in the interest of justice."  Id. § 1552(b).  The Secretary is authorized to make payments for

a claim of pecuniary benefits if "as a result of correcting a record . . . the amount is found to be

due the claimant on account of his . . . service . . . in the Air Force[.]"  Id. § 1552(c)(1).

        The AFBCMR acts in three-member panels, 32 C.F.R. § 865.4(c), and may obtain

advisory opinions on an application from "any Air Force organization or official," id.

§ 865.4(a)(1).  When the AFBCMR obtains a medical advisory opinion with respect to a "former

member of the armed forces who was diagnosed while serving in the armed forces as

experiencing a mental health disorder" and the request for correction of records relates to a

mental health disorder, the opinion must include "the opinion of a clinical psychologist or

psychiatrist[.]"  10 U.S.C. § 1552(g)(1).

Ultimately, the applicant bears the burden of "providing sufficient evidence of material error or injustice." 32 C.F.R. § 865.4(a). The AFBCMR "will recommend relief only when a preponderance (more likely than not) of evidence substantiates that the applicant was a victim of an error or injustice." Air Force Instruction 36-2603, ¶ 4.1 (Sept. 18, 2017).

### B. Harrison's Service in the Air Force

After serving in the United States Army Reserve from 1966 to 1968, Harrison joined the Air Force in 1969, where he served as a pilot. Administrative Record ("AR") 51-54, 62. Between 1971 and 1973, Harrison fought in the Vietnam war, flying B-52 bombing runs out of Guam, Cambodia, and Thailand, during which he was subjected to heavy enemy fire and near-misses with missiles and witnessed the shooting down of many fellow pilots. AR 66. Harrison received several honors and awards during his service and ultimately rose to the rank of captain. AR 62. In November 1973, Harrison was transferred back to Massachusetts and then to Michigan, where he served as a flight instructor and then became chief of training. AR 66.

On September 26, 1976, Harrison was a passenger on a KC-135 Air Force Tanker, along with 14 other passengers and five crew, en route to a Strategic Air Command training session in Nebraska, when the plane crashed near Alpena, Michigan. AR 79-80, 217-18. As Harrison recalled the crash, everything suddenly went white from "arcing electricity everywhere," the auxiliary power unit blew up sending shrapnel and fuel fumes through the plane, the plane dropped from 15,200 feet, and "then we hit the ground and it was like a blow torch." AR 85, 217-18. Harrison was trapped in the burning plane and could see his hands and body burning, while others around him were "screaming and writhing in the flames, being burned beyond recognition," "like they were melting," and he "assumed this was the end." AR 66. He escaped the wreckage after his seatbelt had melted through, and he was able to crawl through an opening

4

in the fuselage.  AR 67, 85, 229.  The plane then exploded.  Id.  Ten passengers and all five crew

members were killed; Harrison was one of only five survivors.  AR 218.

   After crawling out of the wreckage, Harrison had to wait in 38-degree temperatures with

open burn wounds with the other survivors until they were rescued about four hours later and

medevacked to Alpena General Hospital.  AR 67, 117.  According to Harrison, he was placed in

the "'dying' room" for three days because the hospital did not think he would survive.  AR 67.

He was subsequently flown to the Brooke Army Medical Center in San Antonio, Texas, where

he was treated in the burn unit for five months.  AR 67, 117.  Harrison had second- and third-

degree burns over 25% of his body, including on his face, back, thighs, arms, and hands.  AR 88-

89.  He received multiple surgeries and skin grafts for his anterior thighs, forearms, and hands,

which helped save his hands from amputation.  AR 89, 149.  Harrison also had facial

reconstruction surgery for his mouth and lips.  Id.  During his stay in the hospital, he refused to

let his young son and newborn daughter see him because of his appearance.  AR 67.

   On January 13, 1977, an Air Force medical examination signed by Dr. Hugh Peterson

found that Harrison had "complete healing of all burns with significant scarring in many areas"

but that "the skin coverage of his hands are not suitable for use required by a pilot," anticipating

that "his hands will never be serviceable for activity as a pilot or any form of heavy work."  AR

90.  As a result, the Medical Evaluation Board recommended that Harrison be found not

qualified for duty and that he be presented to the Physical Evaluation Board.  AR 224-25.  On

January 31, 1977, the Physical Evaluation Board placed Harrison on the Temporary Disability

Retirement List with a 100% disability rating, effective February 22, 1977.  AR 226-28.

Harrison moved his family to Connecticut and worked for his father's industrial lumber business

in sales; however, he reported that his work was unsuccessful because he had problems "in meeting people" because of the "disfigurement." AR 119-20.

In 1978, as part of the temporary disability retirement process, the Air Force reassessed Harrison's injuries. On May 17, 1978, Dr. John Shepler, Harrison's hand surgeon, evaluated Harrison's burns and found that his hands had healed well, explaining that "[f]rom a mechanical point of view and hand surgery point of view, he has had a superb result and has a normally functional hand." AR 103-05. Dr. Shepler opined, "[A]s a hand surgeon, I can honestly say I feel that this gentleman would be very able to fly an aircraft providing that his psychological status would warrant this"; however, no psychological assessment was performed. AR 105. On June 16, 1978, the Physical Evaluation Board found that Harrison's burns and scars did not render him unfit "singly or in the aggregate" and recommended his removal from the Temporary Disability Retirement List. AR 106.

On June 30, 1978, Harrison responded to the Physical Evaluation Board's recommended findings, indicating that he did not concur with those findings and requesting an appearance before the formal Physical Evaluation Board. AR 107. As a result, Dr. Peterson, who was the Chief of the Plastic Surgery Service and had overseen Harrison's care, examined Harrison and wrote a letter to the Physical Evaluation Board. AR 109-10, 124-25. Although Dr. Peterson "concur[red] with Dr. Shepler that [Harrison] now has essentially a full range of motion and only some minimally web-space contractures" and on that basis could be considered capable of flying an airplane, Dr. Peterson opined that "the extent of [Harrison's] burns both second and third degree . . . have not changed." AR 109. Dr. Peterson explained that Harrison "still has a relatively unserviceable epithelium" which "will bother him the rest of his life, will require avoidance of extremes in temperature and always bother him doing heavy work," and that "[t]he

6

same may be said for the burns of the anterior trunk and thighs." Id. Just as Dr. Shepler had

recognized, Dr. Peterson also noted the need for a psychiatric evaluation, writing, "Although

CPT Harrison is capable of flying, after a thorough psychiatric evaluation[] to evaluate his

reaction to the accident[,] there is no way to expunge the burn scars and resultant skin defects

that he has acquired." Id. Dr. Peterson concluded that Harrison could "in no way be considered"

100% fit to return to active duty, reiterating that "although the range of motion and strength of

[Harrison's] hands are excellent, the skin cover leaves a good bit to be desired and the areas of

burns for which he was initially boarded have not changed." Id. Again, Harrison did not receive

any psychological or psychiatric assessment.

On August 17, 1978, the Physical Evaluation Board held a formal hearing and found that

Harrison was unfit for duty and recommended permanent retirement with a compensable rating

of 50%, which was based on his burns and scars, specifically 10% for his "[h]ead and anterior

trunk," 10% for his "[r]ight arm and hand," 10% for his "[l]eft arm and hand," 10% for his

"[r]ight thigh," and 10% for his "[l]eft thigh." AR 111-12, 136-37. On September 8, 1978, the

Air Force ordered Harrison's permanent retirement for disability with a compensable percentage

of physical disability of 50%. AR 237.

### C. Harrison's AFBCMR Application

After retiring from the Air Force, Harrison stayed home and took care of his children,

experienced agoraphobia, and drank heavily. AR 67. He essentially did not work other than for

a brief period of time at a bank; however, he explained that employment ended after he "became

overwhelmed with rage" at a new supervisor and quit, "fearing he would commit violence

against the man." Id.

In September 2003, Harrison applied to the United States Department of Veterans Affairs

("VA") for disability benefits for PTSD, having received service-connection benefits for his

7

burns with a rating of 60% since 1979.  AR 171, 181.  In that process, he was examined by Dr.
Andrew Meisler at the VA Medical Center in Newington, Connecticut and was diagnosed with
chronic PTSD based on his service in Vietnam and the plane crash.  AR 144-47.  Dr. Meisler
reported that Harrison's medical records "document a long history of PTSD symptoms related to
his Vietnam combat trauma, as well as to the plane crash," and that Harrison described PTSD
symptoms including "intrusive thoughts, distress at reminders, and nightmares," "significant
rages," "avoidance of trauma-specific discussions and reminders, as well as more general social
avoidance."  AR 145.  Dr. Meisler observed that it was "noteworthy" that Harrison had sought
mental health treatment for depression in 1996 but had "refused to address or discuss issues
related to his trauma history due to severe avoidance."  Id.  Dr. Meisler also reported that
Harrison was distressed at the appearance of his scars, and found that it was "significant" that the
scars "serve as a personal and daily reminder of the trauma he suffered."  Id.

     As a result, in February 2004, the VA granted Harrison a 10% disability rating for
service-connected PTSD, effective September 10, 2003, which it upgraded to 70% disabling in
March 2006, effective August 31, 2004.  AR 171-81.  In May 2005, the Social Security
Administration rated plaintiff 100% disabled.  AR 67.

     Starting in 2011 and proceeding pro se, Harrison applied to the AFBCMR seeking an
increase in his disability rating for his physical injuries, arguing that the Physical Evaluation
Board had erred in limiting its evaluation of his burns to the functionality of his hands.  Although
Harrison mentioned that the Physical Evaluation Board also did not consider his psychological
trauma, the focus of his request was not PTSD but his burn injuries.  AR 838.  The AFBCMR
denied his application on February 12, 2015.  AR 838-44.

While the AFBCMR process was ongoing, on September 3, 2014, Secretary of Defense

Chuck Hagel issued guidance ("Hagel Memorandum") directing the boards for correction of

military records to give "liberal consideration" to petitions based on PTSD, including "in cases

where civilian providers confer diagnoses of PTSD or PTSD-related conditions[.]"  AR 238-41.

Secretary Hagel remarked that "PTSD was not recognized as a diagnosis at the time of service"

for Vietnam veterans and that "in many cases, diagnoses were not made until decades after

service was completed."  AR 238.  Recognizing that the service records of Vietnam veterans

may not reflect medical conditions like PTSD, Secretary Hagel directed the boards to

> fully and carefully consider every petition based on PTSD brought by each veteran.
> This includes a comprehensive review of all materials and evidence provided by the
> petitioner.  Quite often, however, the records of Service members who served before
> PTSD was recognized, including those who served in the Vietnam theater, do not
> contain substantive information concerning medical conditions in either Service
> treatment records or personnel records.  It has therefore been extremely difficult to
> document conditions that form a basis for mitigation in punitive, administrative, or
> other legal actions or to establish a nexus between PTSD and the misconduct
> underlying the Service member's discharge with a characterization of service of under
> other than honorable conditions.

Id.  On February 24, 2016, Acting Principal Deputy Under Secretary of Defense Brad Carson

issued a memorandum ("Carson Memorandum") which reaffirmed the Hagel Memorandum and

provided that the boards for correction of military records "will waive, if it is applicable and bars

consideration of cases, the imposition of the statute of limitation," emphasizing that "[f]airness

and equity demand, in cases of such magnitude, that a [v]eteran's petition receives full and fair

review, even if brought outside of the time limit."  AR 242.

On August 25, 2017, Acting Under Secretary of Defense for Personnel and Readiness

A.M. Kurta issued clarifying guidance ("Kurta Memorandum") for petitions based on mental

health conditions, sexual assault, and sexual harassment.  AR 243-47.  Although Acting Under

Secretary Kurta acknowledged that the guidance was "not intended to interfere with or impede

9

the Board's statutory independence," he emphasized that "[i]nvisible wounds . . . are some of the most difficult cases [the boards] review and there are frequently limited records for the boards to consider, often through no fault of the veteran, in resolving appeals for relief." AR 243. Accordingly, Acting Under Secretary Kurta instructed that "[s]tandards for review should rightly consider the unique nature of these cases and afford each veteran a reasonable opportunity for relief even if . . . the mental health condition was not diagnosed until years later." Id. The clarifying guidance reiterated the "[l]iberal consideration" afforded to petitions based on mental health conditions including PTSD and explained that "[e]vidence may come from sources other than a veteran's service record and may include records from . . . mental health counseling centers, hospitals, physicians . . . and statements from family members," and that "[e]vidence may also include changes in behavior . . . episodes of depression, panic attacks, or anxiety without an identifiable cause," and "unexplained economic or social behavior changes[.]" AR 244. The guidance further provided that "[a] diagnosis made by a licensed psychiatrist or psychologist that the condition existed during military service will receive liberal consideration" and that a determination by the VA "that a veteran's mental health condition, including PTSD . . . is connected to military service, while not binding on the Department of Defense, is persuasive evidence that the condition existed or experience occurred during military service." AR 245.

The Kurta Memorandum provided additional clarification as to the meaning of "liberal consideration," explaining that it "includes but is not limited to the following concepts":

> a. Some circumstances require greater leniency and excusal from normal evidentiary burdens.
>
> b. It is unreasonable to expect the same level of proof for injustices committed years ago when . . . mental health conditions, such as PTSD . . . were far less understood than they are today. . . .

10

      d. Mental health conditions, including PTSD . . . impact veterans in many intimate ways, are often undiagnosed or diagnosed years afterwards, and are frequently unreported. . . .

      f. Reviews involving diagnosed, undiagnosed, or misdiagnosed . . . mental health conditions, such as PTSD . . . should not condition relief on the existence of evidence that would be unreasonable or unlikely under the specific circumstances of the case.

      g. Veterans with mental health conditions, including PTSD . . . may have difficulty presenting a thorough appeal for relief because of how the asserted condition or experience has impacted the veteran's life. . . .

      j. Service members diagnosed with mental health conditions, including PTSD . . . receive heightened screening today to ensure the causal relationship of possible symptoms and discharge basis is fully considered, and characterization of service is appropriate.   Veterans discharged under prior procedures, or before verifiable diagnosis, may not have suffered an error because the separation authority was unaware of their condition or experience at the time of discharge.  However, when compared to similarly situated individuals under today's standards, they may be the victim of injustice because commanders fully informed of such conditions and causal relationships today may opt for a less prejudicial discharge to ensure the veteran retains certain benefits, such as medical care. . . .

AR 247. The guidance also makes clear that "[l]iberal consideration does not mandate an

upgrade." Id. The Kurta Memorandum further clarifies that the guidance documents, including

the Hagel Memorandum and Carson Memorandum, apply not only to "Under Other Than

Honorable Condition discharge characterizations but rather apply to any petition seeking

discharge relief including requests to change the narrative reason[.]"  AR 246.

      On May 4, 2017, Harrison, now represented by counsel, applied for reconsideration of his

previous AFBCMR application, citing the Hagel and Carson Memoranda and arguing that he

should have been given a 100% disability rating based on both physical and mental disabilities in

1978.  Specifically, he argued that his disability rating of 50% reflects errors and injustices in

that it did not incorporate the PTSD he was suffering from at the time of his retirement.  He also

maintained that the 1978 Physical Evaluation Board erred in failing to evaluate his mental health,

and under present regulations, he would have received a psychological exam and the minimum disability rating he could receive for PTSD alone would have been 50%. AR 44, 46 (citing 38 C.F.R. § 4.129, which is not retroactive but mandates a rating of "not less than 50 percent" when a veteran is released from active duty due to a "mental disorder that develops in service as a result of a highly stressful event" pursuant to a memorandum adopted by the Department of Defense in 2008, see Russell v. United States, 106 Fed. Cl. 696, 699-700 (2012)). Harrison included a psychological evaluation dated April 15, 2016 from Dr. David Johnson, a Yale School of Medicine professor and PTSD expert, who determined that Harrison was "more likely than not" suffering from PTSD at the time of his retirement and was "100% disabled as of February, 1977 from the PTSD caused by the plane crash." AR 68-69. Dr. Johnson opined that a psychiatric examination should have been performed in 1978. Even though no official diagnosis of PTSD existed at that time, Dr. Johnson explained "[h]ad a psychiatric examination been given at that time, it is more likely than not that a recommendation would have been made for 100% disability due to a psychiatric condition, most likely an anxiety disorder." AR 69.

Harrison also submitted the assessments conducted by Dr. Meisler in 2003 and 2004 for the VA, which found that Harrison suffered from PTSD as a result of combat trauma in Vietnam and the plane crash. See AR 140-57. In addition, he included a 2005 evaluation by Thomas Michaels, a readjustment counseling therapist at Hartford Vet Center, which is associated with the VA, that discussed Harrison's reported PTSD symptoms, including "nightmares and invasive thoughts," "avoidance," "detachment from other people," "enhanced startle response," "insomnia," "outbursts of anger," and "poor concentration," and observed that Harrison had been living with PTSD and depression as a result of his military experiences. AR 800-01. Lastly, Harrison attached an examination performed in 2005 by Dr. Wendy Underhill, a clinical

psychologist associated with the Connecticut Disability Determination Services, which evaluates social security disability claims, who described Harrison's PTSD symptoms and affirmed his diagnosis of PTSD relating to his military service. AR 802-04. According to Dr. Underhill, Harrison reported "frequent intrusive thoughts of his Vietnam experiences and of his plane crash," "flashback experiences" including "seeing 'a ring of firing missiles at me—I was trying to avoid,'" "frequent nightmares," "rage reactions and difficulty controlling his temper," and depression, among other symptoms. AR 803.

        In July 2018, Harrison received two Air Force medical advisory opinions from the AFBCMR. The first medical advisory opinion was provided by the AFBCMR's primary medical advisor, Dr. Horace Carson, who plaintiff points out is an emergency room physician with no expertise in PTSD or mental health. Dr. Carson reviewed Harrison's records from his Physical Evaluation Board proceedings in 1977 and 1978, the VA's 2003 and 2004 examinations and PTSD diagnosis, and Dr. Johnson's 2016 examination and PTSD diagnosis. Dr. Carson found that it was "reasonable to conclude that there _was_ an expected immediate emotional impact of the plane crash upon [Harrison's] psyche, both acutely, then, and now, as manifested by chronic PTSD," but explained that the question in the case "is to determine whether there was a sufficiently detectable mental impairment at the time of [Harrison's] military service, which should have been an independent cause for career termination; regardless of availability of alternative diagnostic nomenclature at the time." AR at 250. Dr. Carson recognized that Harrison's PTSD diagnosis warranted giving "liberal consideration" to his petition, and advised the Board to consider the "negative stigma associated with mental health care at the time, particularly within the flying community" including the "possibility of downplaying [non-reporting] of symptoms by the patient, despite the realities of emotional impact; thus avoiding a

13

clinical trigger for a mental health evaluation[.]" Id. Dr. Carson observed that the records show

that Harrison's physical wounds are a "constant reminder of his experiences and likely have

contributed to evolution and sustainment of his PTSD," which is "not to debunk the possible

existence of a mental impairment at the time of the applicant's service," but to "make clear that

decisions were based upon clinical presentations and disclosures at the time of MEB/PEB action

and the TDRL re-evaluation; the latter another missed opportunity for a mental health evaluation

IF, there were signs or symptoms observed or disclosed at that time." Id. Dr. Carson also

explained the differences between the military departments and the VA, in that the military

departments make fitness determinations based on evidence present at the "snapshot" time of

military service, but the VA makes determinations without regard to a service member's fitness

to serve and may adjust service-connected disability ratings as the level of impairment changes

over the lifetime of the veteran. AR 251.

Although Dr. Carson acknowledged that PTSD was not recognized as an official

diagnosis at the time of Harrison's service and that "there is no clinical evidence that [Harrison]

was ever evaluated for or diagnosed with PTSD until CY 2003," he ultimately concluded that

"the fact that there has been a nexus established between the applicant's military experiences and

the development of PTSD, it [sic] not determinative that PTSD, or any other mood disorder, was

unfitting at the time of military service and should have been a contributing cause of career

termination." AR 251. Lastly, Dr. Carson recognized that a mental health advisor's opinion

was required given Harrison's PTSD diagnosis. AR 250.

That mental health advisory opinion was provided by a psychiatric advisor, Dr. Natalya

Chernyak. AR 253. Her opinion was extremely limited to nothing more than one paragraph in

which she simply agreed with Dr. Carson, concluding: "This psychiatric consultant would like to

14

thank applicant for his heroic service. Regrettably, this advisor fully concurs with the opinion of the medical consultant and recommends denial." Id. Without providing any analysis, Dr. Chernyak also wrote that she "finds insufficient evidence to warrant the desired change of the record." Id.

On August 21, 2018, Dr. Sharon Cooper, a VA clinical psychologist who had treated Harrison since 2009 and met with him at least 126 times, provided the Board with an opinion countering those of Dr. Carson and Dr. Chernyak. Based on her work with Harrison and information from his wife, which had helped Dr. Cooper "understand how his military service impacted his mental, emotional, physical, occupational, and social functioning, both at the time of and since his military retirement," Dr. Cooper concluded that Harrison was suffering from PTSD since the plane crash in 1976. AR 268-69. Dr. Cooper explained:

> It is my professional opinion that even if Captain Harrison's physical wounds were able to heal in a way that would make him fit for worldwide service in the Air Force, he more likely than not would have been medically retired from the Air Force after the plane crash because he would not have been psychologically fit to fly based on the psychiatric symptoms he displayed at the time, including: recurrent and intrusive memories of the accident (seeing and smelling burning flesh, hearing his fellow pilots screaming as they were burned alive), recurrent distressing dreams of the plane crash, intense distress at the thought of flying in an airplane, physiological reactivity at reading accounts of the plane crash or hearing about other plane crashes, mood dysregulation (depression, anxiety, low self-worth, suicidal thoughts), efforts to avoid talking about the plane crash, efforts to avoid connecting with any veterans and activities (in the years following discharge), diminished interest and participation in family, social, and occupational activities (in the years following discharge), feeling distant and numb from others (in the years following discharge), restricted range of feelings, difficulty sleeping, frequent and extreme bouts of anger, which he tried to manage (unsuccessfully) with heavy alcohol use, difficulty focusing and concentrating, hypervigilance, and an extreme startle response.

AR 269. Dr. Cooper emphasized that "it is not the diagnosis alone that made him unfit to serve"—pointing out that PTSD was not recognized as a diagnosis at the time—"but rather the extensive, chronic, and persistent psychiatric symptoms that interfered with his ability to carry

out his duties (in any capacity) that would have made him unfit for continued military service."
Id. On August 27, 2018, Harrison filed a formal response to the two medical advisory opinions.
AR 1117-32.

Harrison received a third Air Force advisory opinion dated October 16, 2018, which was
unsigned and did not include the name, title, or qualifications of the author. Harrison contends
that the Air Force only disclosed the author's name, Dr. Trina Do, who was a psychological
advisor, after he initiated this civil action. [Dkt. No. 44] at 15 n.5. In her report, Dr. Do
acknowledged that Harrison "sustained debilitating physical injuries" in the 1976 plane crash and
had "no objections that the incident have [sic] affected him psychologically as well," but
explained that the focus of the Board's review is on the "'snapshot' in time[.]" AR 271. She
observed that his records at the time showed "no documentation or reports that applicant had or
made any complaints of any mental health conditions or symptoms to his providers or chain of
command." AR 271-72. Dr. Do pointed out that the narrative summary from the Medical
Evaluation Board's assessment dated January 13, 1977 indicated that "[t]he patient presented as
a well-developed male in no acute distress" and that the "neurologic examination was grossly
intact." AR at 272. Although she acknowledged that a full or thorough psychological
assessment was not performed, Dr. Do found that "there was no observation or report of any or
mental health or psychological symptoms or concerns from applicant." Id.

Dr. Do then turned to the examinations from Dr. Johnson and Dr. Cooper and their
findings that Harrison was 100% disabled or unfit for service in 1978, concluding that their
opinions were "purely speculative and not confirming." Id. (emphasis in original). She
explained that neither doctor evaluated Harrison when he was in service and "cannot accurately
assess [his] presenting symptoms at the time," that "39 years" had elapsed between the 1976

plane crash and their evaluations, and that "external stressors, experiences, and progression of the condition or disease more likely than not may have influenced and impacted applicant's clinical presentation at the time of evaluation." Id. She concluded that "their evaluations are applicable to applicant's presentation at the time of evaluation and not the snapshot of time in service." Id. (emphasis in original).

Dr. Do then responded to Harrison's contentions that he had not received a psychological evaluation in 1978, asserting that Dr. Shepler's and Dr. Peterson's comments had been "misinterpreted." AR 272-73. Dr. Do explained that based on her review of the records, Dr. Shepler and Dr. Peterson mentioned a need for psychiatric evaluation as a precondition to returning to flying, but because Harrison was found to be not medically retainable, a psychological assessment about his ability to fly was "not necessary." AR 273. She added that because Harrison "made no complaints of any mental health symptoms . . . a psychological assessment was also not warranted nor performed." Id. Accordingly, she concluded that "there was no error from the Air Force that applicant was not afforded a psychological assessment to determine his fitness for duty or mental health status." Id.

Dr. Do agreed that PTSD was not recognized as a diagnosis until 1980, but opined that "detectable mental impairment . . . is necessary to determine fitness for duty or causal [sic] of career termination regardless of available alternative diagnostic nomenclature of the time." Id. She also pointed out that a service-related PTSD diagnosis does not automatically result in the condition being determined unfitting for service leading to medical separation or retirement. Id. Finally, she acknowledged the VA's examination and disability determination but explained the differences between the VA's process and the military departments' focus on a service member's fitness at the time of service. AR 273-74. Dr. Do found that "due to the lack of mental health

diagnoses or conditions, it cannot be definitively determined that [Harrison] had a debilitating or unfitting mental health condition warranting a medical separation from service at the snapshot in time," concluding that "there is insufficient evidence to support his request for an upgrade." AR 272, 274.

On December 21, 2018, Harrison filed a response to the AFBCMR's third advisory opinion which included a response from Dr. Johnson. AR 580-604. Dr. Johnson explained that "at the time of the airplane crash there was no diagnosis of PTSD" and, based on his experience serving as a psychologist for the VA at the time, there was "no procedure or theory within psychiatry that would lead any well-qualified physician to order a psychological evaluation that would reveal the symptoms of PTSD." AR 602. He opined that "symptoms of PTSD can be obvious, or hidden, and for Captain Harrison not to display overt symptoms would not be uncommon" in the military at the time. Id. He pointed out that "the absence of evidence in this case . . . is NOT due to the absence of symptoms," but "IS due to the fact that there was no possibility of performing the evaluation that would have revealed his disorder." Id. (emphasis in original). Dr. Johnson explained that today "all experts in the field would conclude that anyone" who had experienced the trauma Harrison endured in the 1976 plane crash "would be automatically assumed to be suffering from PTSD." AR 603 (emphasis in original).

On September 11, 2019, the AFBCMR voted to deny Harrison's request for reconsideration and issued a written decision. AR 11-21. The AFBCMR reviewed Harrison's contentions and recited the applicable legal standard, including the Hagel, Carson, and Kurta Memoranda's guidance on the "liberal consideration" afforded to applications based on PTSD. AR 11-13. The AFBCMR summarized Harrison's medical records from 1976 to 1978, Dr. Carson's, Dr. Chernyak's, and Dr. Do's opinions, Harrison's responses to those advisory

opinions, and Dr. Cooper's and Dr. Johnson's evaluations. AR 12-19. The AFBCMR found that

Harrison had "failed to sustain his burden of proof that he has been the victim of an error or

injustice," concurring with Dr. Carson, Dr. Chernyak, and Dr. Do that a "preponderance of the

evidence does not substantiate counsel's contentions." AR 19. The AFBCMR explained:

> Counsel provides statements from two psychologists who opine the applicant suffered
> from PTSD during military service and claims it would have been unfitting for
> continued military service had PTSD been a diagnosis at this time. These clinical
> opinions are not proof of the applicant's mental status at the time of his release from
> TDRL [Temporary Disability Retirement List]. The Board finds it difficult to usurp
> or invalidate clinical evidence during the applicant's period of service with clinical
> opinions based upon symptoms reported, and rating decisions made over four decades
> later.

Id. The AFBCMR also did not find the VA's assessment conclusive, reasoning that

> the fact that the Department of Veterans Affairs assigned the applicant a 70 percent
> disability rating for PTSD is not proof that the ratings underlying these actions are
> reflective of the applicant's actual functionality at the time of his release from the
> TDRL in 1978.

Id. Ultimately, the AFBCMR concluded that it was "satisfied that the application of liberal

consideration does not warrant relief" and recommended against the correction of Harrison's

records. AR 20. The AFBCMR found that Harrison had not shown that a "personal appearance,

with or without counsel, would materially add to the Board's understanding of the issues

involved" and declined to hold a formal hearing. Id.

### D. Procedural History

On May 18, 2022, Harrison filed a three-count Complaint challenging the AFBCMR's

decision in the United States District Court for the District of Columbia. [Dkt. No. 1].

Defendant moved to transfer this civil action for improper venue to the District of Maryland.

[Dkt. No. 15]. Harrison subsequently filed an unopposed motion to transfer venue to the Eastern

District of Virginia, [Dkt. No. 17], which was granted on November 1, 2022, [Dkt. No. 18]. The

civil action was transferred to this district on November 15, 2022. [Dkt. No. 19].

Count I of the Complaint alleges that the AFBCMR's decision is final agency action that is arbitrary and capricious in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), because it (1) relied on inadequate medical advisory opinions (2) failed to weigh or consider multiple medical opinions and reports, (3) failed to apply the preponderance of the evidence standard; (4) incorrectly applied the "liberal consideration" standard for assessing mental health evidence and PTSD diagnoses, and (5) failed to disclose the name and qualifications of the unidentified author of the October 2018 opinion. Count II alleges that the AFBCMR's decision constitutes ultra vires action that is "outside its statutory authority and contrary to the applicable regulations" in violation of the APA, 5 U.S.C. § 706(2)(C). Count III alleges a procedural due process violation from the AFBCMR's adjudication of Harrison's application. The Complaint seeks declaratory and injunctive relief and requests that the Court "set aside the AFBCMR's September 2019 decision, direct the Defendant to change Capt. Harrison's medical retirement rating to 100% medical retirement retroactive to 1978, or remand Capt. Harrison's application with an order to re-evaluate his application under the correct standards and considering all record evidence." [Dkt. No. 1] ¶ 9.

The parties have fully briefed their cross-motions for summary judgment [Dkt. Nos. 43, 46], which they agreed would be based on the administrative record, and argument has been held.

## II. SUBJECT MATTER JURISDICTION

Defendant has moved to dismiss the Complaint for lack of subject matter jurisdiction on the grounds that plaintiff's claims are "in substance" claims for monetary relief and therefore fall within the exclusive jurisdiction of the Court of Federal Claims pursuant to the Tucker Act, 28

U.S.C. § 1491(a). [Dkt. No. 47] at 11. Plaintiff counters that the Complaint seeks only equitable relief and therefore jurisdiction is proper under the APA.

At oral argument, defendant clarified that it contests jurisdiction only to the extent that Harrison requests that this Court grant relief by correcting his disability retirement rating to 100% retroactive to 1978 and does not contest jurisdiction to the extent that the remedy sought is a remand to the AFBCMR. Plaintiff provides no support for the assertion that a district court has the authority to order a substantive change to a military record under the APA. Instead, under the APA, a district court is authorized to "hold unlawful and set aside agency action, findings, and conclusions," 5 U.S.C. § 706(2), and the ordinary remedy upon a finding that final agency action violates the APA is vacatur of the decision and remand to the agency. Ordering a specific remedy or outcome on remand as to Harrison's appropriate disability rating is inconsistent with the Court's role in reviewing final agency action under the APA, in which it "sits as an appellate tribunal." Palisades Gen. Hosp. Inc. v. Leavitt, 426 F.3d 400, 403 (D.C. Cir. 2005); see SEC v. Chenery Corp., 318 U.S. 80, 94-95 (1943). Accordingly, the Court finds that it lacks the authority to grant Harrison's request to change his military record. At oral argument, Harrison agreed to drop that form of relief from the Complaint and agreed that remand is the appropriate remedy should he prevail on the merits. Nevertheless, the Court is required to independently determine that jurisdiction exists under the APA. For the foregoing reasons, the Court finds that Harrison's claims are properly brought under the APA.

## A. **Standard of Review**

Rule 12(b)(1) requires that a civil action be dismissed when the court lacks subject matter jurisdiction over the dispute. The plaintiff bears the burden of proving that subject matter jurisdiction exists. Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir. 1982). When, as here, the defendant "challenges the existence of subject matter jurisdiction in fact, the plaintiff bears the

burden of proving the truth of such facts by a preponderance of the evidence." U.S. ex rel. Vuyyuru v. Jadhav, 555 F.3d 337, 347 (4th Cir. 2009).

**B. Analysis**

Because the United States "may not be sued without its consent," a district court lacks subject matter jurisdiction over a suit against the United States absent an express waiver of sovereign immunity. United States v. Mitchell, 463 U.S. 206, 212 (1983). As the Fourth Circuit has explained, "plaintiffs . . . challenging a decision of a board for the correction of military records[] have used one of two avenues to establish federal jurisdiction: the Tucker Act . . . and the Administrative Procedures Act," both of which have been construed as waivers of sovereign immunity. Randall v. United States, 95 F.3d 339, 345 (4th Cir. 1996).

Harrison challenges the AFBCMR's decision under the APA, which operates as a limited waiver of sovereign immunity over actions "seeking relief other than money damages[.]" 5 U.S.C. § 702; see Randall, 95 F.3d at 346. In addition, review under the APA is available only in the case of "final agency action for which there is no other adequate remedy in a court[.]" Id. § 704.

The Tucker Act grants jurisdiction to the United States Court of Federal Claims to "render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a). The jurisdiction of the Court of Federal Claims is concurrent with that of federal district courts for claims for money damages against the United States for $10,000 or less under the Little Tucker Act, 28 U.S.C. § 1346(a)(2), but is exclusive for claims exceeding $10,000 (unless the plaintiff waives damages in excess of $10,000 to remain in district court). See Randall, 95 F.3d at 347 & n.8. As a "general rule, . . . 'the Court of

22

[Federal] Claims has no power to grant equitable relief," id. at 347 (quoting Richardson v. Morris, 409 U.S. 464, 465 (1973) (per curiam)); however, the Tucker Act authorizes courts to award injunctive relief in "limited circumstances." Id. Specifically, "[t]o provide an entire remedy and to complete the relief afforded by the judgment, the court may, as an incident of and collateral to any such judgment, issue orders directing restoration to office or position, placement in appropriate duty or retirement status, and correction of applicable records, and such orders may be issued to any appropriate official of the United States." 28 U.S.C. § 1491(a)(2); see James v. Caldera, 159 F.3d 573, 580-81 (Fed. Cir. 1998) (observing that "limited equitable relief sometimes is available in Tucker Act suits" but it must be "'an incident of and collateral to' a money judgment" (quoting § 1491(a)(2))).

Accordingly, judicial review is proper under the APA if "the relief sought is nonmonetary and no adequate remedy exists in another court." Williams v. Roth, No. 8:21-CV-02135-PX, 2022 WL 4134316, at *5 (D. Md. Sept. 12, 2022) (citing Randall, 95 F.3d at 346). If Harrison's action sought money damages, the APA's waiver of sovereign immunity would not apply, and because it is undisputed that his claims would exceed $10,000, they would need to be brought in the Court of Federal Claims pursuant to the Tucker Act. See Clinton v. Goldsmith, 526 U.S. 529, 539-40 (1999) (observing that a service member claiming "something other than monetary relief" may have recourse under the APA in a federal district court, and "[i]n the instances in which a claim for monetary relief may be framed," the service member may bring a claim in the Court of Federal Claims or a district court under the Little Tucker Act).

On its face, the Complaint seeks only equitable relief; however, to determine whether a claim seeks money damages or equitable relief, the Fourth Circuit looks to the "essence" of the claim and the relief sought. Randall, 95 F.3d at 347. Even though a "complaint phrases its

request for money as a request for equitable relief, Claims Court jurisdiction cannot be avoided by framing an essentially monetary claim in injunctive or declaratory terms." Portsmouth Redevelopment & Hous. Auth. v. Pierce, 706 F.2d 471, 474 (4th Cir. 1983); see Suburban Mortg. Assocs., Inc. v. Dep't of Hous. & Urb. Dev., 480 F.3d 1116, 1124 (Fed. Cir. 2007). Nonetheless, "[a] suit which does not seek monetary damages does not arise under the Tucker Act simply because the plaintiff's success will result in eventual monetary gain from the government." Powe v. Sec'y of Navy, 35 F.3d 556, at *2 (4th Cir. 1994) (unpublished table decision).  If the "essence of a claim is the equitable relief sought, and any financial ramifications of a favorable decision are subordinate to the equitable relief, the Court of Federal Claims does not have exclusive jurisdiction over that claim." Roetenberg v. Sec'y of the Air Force, 73 F. Supp. 2d 631, 636 (E.D. Va. 1999); see Admin. Subpoena Walgreen Co. v. U.S. Drug Enf't Admin., 913 F. Supp. 2d 243, 248 (E.D. Va. 2012) (explaining that the Tucker Act "does not itself confer jurisdiction where there are no monetary damages or a monetary component of the relief sought upon which to premise jurisdiction under the Tucker Act").

Here, the essence of the Complaint is equitable relief.  Harrison asks that this Court set aside the AFBCMR's decision as arbitrary and capricious and remand his application to the AFBCMR, which is "the heartland of equitable relief available under the APA, not money damages." Williams, 2022 WL 4134316, at *5.  Even though, on remand, a finding by the AFBCMR in Harrison's favor to include a diagnosis of PTSD in his records and increase his disability rating may result in the payment of retroactive retirement benefits to him, such "eventual monetary gain" does not convert his claim into a Tucker Act claim for money damages. Powe, 35 F.3d at *3; see Smalls v. United States, 471 F.3d 186, 190 (D.C. Cir. 2006) ("The fact that in seeking the correction of a military record the plaintiff may, if successful,

obtain monetary relief from the United States in subsequent administrative proceedings is

insufficient to deprive the district court of jurisdiction."); Bowen v. Massachusetts, 487 U.S. 879,

893 (1988) (distinguishing between "money damages," which refers to an "action at law for

damages . . . intended to provide a victim with monetary compensation for an injury to his

person, property, or reputation," and an "equitable action for specific relief . . . which may

include an order providing for . . . 'the recovery of specific property or monies'" (quoting Larson

v. Dom. & For. Comm. Corp., 337 U.S. 682, 688 (1949)). Rather, the future financial benefit

that plaintiff might receive from a favorable decision is "subordinate to the equitable relief"

sought in the Complaint. Roetenberg, 73 F. Supp. 2d at 636; see Nieves v. McHugh, 111 F.

Supp. 3d 667, 677 (E.D.N.C. 2015). The issue before the Court is the propriety of the

AFBCMR's decision-making process, and judgment in Harrison's favor should he prevail would

not automatically result in monetary relief; instead, any monetary recovery would come after

subsequent review by the AFBCMR of his application, the AFBCMR's determination of his

proper disability rating, and the Air Force's retirement benefits process.[2] See Tootle, 446 F.3d at

175 ("[A]ny monetary benefits that might flow if [the plaintiff] prevails on his non-monetary

---

[2] As further indication that "any monetary recovery [Harrison] might be entitled to in the future would be entirely separate from the [d]istrict [c]ourt's decision regarding whether the [g]overnment acted arbitrarily and capriciously," Tootle v. Sec'y of Navy, 446 F.3d 167, 175 (D.C. Cir. 2006), should Harrison prevail in obtaining an increased disability rating before the AFBCMR on remand, he would likely need to take additional steps through the Department of Defense's administrative process to obtain any increased payments. For example, 38 U.S.C. § 5304 prohibits the duplication of disability benefits and retirement pay, and a military retiree is ordinarily required to waive a portion of their retired pay equal to the amount of their VA disability compensation pay under 38 U.S.C. § 5305; however, statutory programs also exist that permit eligible service members to recover some of the waived retired pay. It is not this Court's role to speculate beyond the administrative record as to what will happen to Harrison's claim for retirement benefits following a remand. In short, "[a]t most, a [d]istrict [c]ourt decision in [Harrison's] favor would enable him to avail himself of statutory and regulatory provisions and procedures that may, or may not, entitled him to a monetary recovery." Tootle, 446 F.3d at 175.

claims will not come from the [d]istrict [c]ourt's exercise of jurisdiction, 'but from the structure

of statutory and regulatory requirements governing compensation when a servicemember's files

change.'" (quoting Kidwell v. Dep't of the Army, 56 F.3d 279, 285-86 (D.C. Cir. 1995))).

Accordingly, plaintiff's claims are not "in essence" claims for money damages, and they fall

within this Court's jurisdiction under the APA.

   Case law from the District of Columbia Circuit, where many complaints challenging

decisions of boards for correction of military records are filed, supports this conclusion.  Like the

Fourth Circuit, the District of Columbia Circuit also evaluates whether a complaint for equitable

relief is "in essence" a claim for money damages to determine whether the claim is subject to the

Tucker Act, "look[ing] to the complaint's substance, not merely its form."  Kidwell, 56 F.3d at

284.  Even if the plaintiff "hints at some interest in a monetary reward from the federal

government" or "success on the merits may obligate the United States to pay the complainant,"

"as long as the plaintiff's complaint only requests non-monetary relief that has 'considerable

value' independent of any future potential for monetary relief—that is, as long as the sole

remedy requested is declaratory or injunctive relief that is 'not negligible in comparison' with the

potential monetary recovery," the plaintiff's choice of remedies is respected and jurisdiction in

the district court is appropriate.  Id. (internal citations omitted); see Tootle, 446 F.3d at 175.

   Here, the equitable relief sought by Harrison has significant value.  In his Complaint,

Harrison seeks equitable relief to "right these errors and injustices" and remedy the "decades-

long injustices [he] has endured to his—and his family's—detriment" from the Air Force's

failure to recognize the devastating impact of the plane crash on his mental health and to correct

his records to reflect that debilitating mental trauma. [Dkt. No. 1] ¶¶ 8-9.  Apart from the

potential for future monetary benefits from an increased disability rating, obtaining recognition

that he was suffering from PTSD at the end of his military service and ensuring the accuracy of

his discharge narrative has value for a retired service member like Harrison, particularly where

the Department of Defense has since recognized that PTSD is invisible and often

unacknowledged for Vietnam veterans.

In sum, because plaintiff's claims are "in essence" not a claim for money damages but for

equitable relief, they do not fall within the jurisdiction of the Court of Federal Claims pursuant to

the Tucker Act[3] and are properly within this Court's jurisdiction under the APA's limited waiver

of sovereign immunity pursuant to 5 U.S.C. § 702.  For these reasons, the Court finds that it has

subject matter jurisdiction over this civil action.

### III. MERITS

Plaintiff and defendant have moved for summary judgment on the APA claims.  As

defendant points out, plaintiff did not move for summary judgment on his procedural due process

claim (Count III) and appears to have abandoned the claim.  Plaintiff does not dispute that

observation in his opposition memorandum, therefore Count III will be dismissed and the Court

has only considered the merits of the APA claims.

**A.  Standard of Review**

Decisions of the AFBCMR are final agency actions that are subject to judicial review

under the APA.  See Chappell v. Wallace, 462 U.S. 296, 303 (1983).  The APA "confines

judicial review of executive branch decisions to the administrative record of proceedings before

---

[3] Moreover, because there is no claim for money damages, "the Court of Federal Claims would
be powerless to award [him] the relief [he] seeks here."  Roetenberg, 73 F. Supp. 2d at 636
(reasoning that the Court of Federal Claims may "grant equitable relief only 'incident of and
collateral to' rendering a money judgment").  Accordingly, there is no "adequate remedy" in the
Court of Federal Claims or any other forum, satisfying 5 U.S.C. § 704.  See Randall, 95 F.3d at
347; Williams, 2022 WL 4134316, at *6.

the pertinent agency," Shipbuilders Council of Am. v. U.S. Dep't of Homeland Sec., 770 F.

Supp. 2d 793, 802 (E.D. Va. 2011), and "[j]udicial review of the final decision of a military

correction board . . . is limited to a determination of whether the board's decision 'is arbitrary and

capricious, contrary to law, or unsupported by substantial evidence,'" Thompson v. United

States, 119 F. Supp. 3d 462, 468 (E.D. Va. 2015) (quoting Frizelle v. Slater, 111 F.3d 172, 176

(D.C. Cir. 1997)).  In conducting that review, the Court examines the administrative record and

determines "whether the agency considered the relevant factors and whether a clear error of

judgment was made."  Ohio Valley Env't Coal. v. Aracoma Coal Co., 556 F.3d 177, 192 (4th

Cir. 2009) (citing Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971)).

The Court must make a "searching and careful" inquiry of the record, but is "not empowered to

substitute its judgment for that of the agency"; rather, "[d]eference is due where the agency has

examined the relevant data and provided an explanation of its decision that includes 'a rational

connection between the facts found and the choice made,'" id. (quoting Motor Vehicle Mfrs.

Ass'n v. State Farm Mutual Auto. Ins. Co., 463 U.S. 29, 43 (1983)).

　　　"Challenges to the [AFBCMR's] decisions are considered under an 'unusually deferential

application of the arbitrary or capricious standard of the APA'" to ensure that courts "function

neither as a 'super correction board,' . . . nor as a 'forum for appeals by every soldier dissatisfied

with [a military personnel action or decision], a result that would destabilize military command

and take the judiciary far afield of its area of competence.'" Downey v. U.S. Dep't of the Army,

110 F. Supp. 3d 676, 686-87 (E.D. Va. 2015), aff'd 685 F. App'x 184 (4th Cir. 2017) (quoting

Cone v. Caldera, 223 F.3d 789, 793 (D.C. Cir. 2000) and Charette v. Walker, 996 F. Supp. 43, 50

(D.D.C. 1998)).  Nevertheless, "when a [military records] correction board fails to correct an

injustice clearly presented in the record before it, it is acting in violation of its [statutory]

mandate [under 10 U.S.C. § 1552]. And such a violation, contrary to the evidence, is arbitrary and capricious." Haselwander v. McHugh, 774 F.3d 990, 996 (D.C. Cir. 2014).

**B. Analysis**

Harrison challenges the AFBCMR's decision as arbitrary and capricious and contrary to the evidence on several grounds. First, he argues that the AFBCMR acted arbitrarily and capriciously in denying his application because it failed to apply liberal consideration to his application and summarily dismissed the opinions of his doctors supporting that he had PTSD in 1978 which rendered him unfit for service. Harrison points out that the AFBCMR, as well as the Air Force's advisory opinions with which the AFBCMR concurred, incorrectly relied on the absence of clinical evidence during his period of service, because no psychological examination was ever performed during his service. He maintains that this reliance was inconsistent with the Hagel and Kurta Memoranda, which sought to provide relief to veterans suffering from PTSD and directed the boards to consider evidence, including subsequent medical diagnoses made years after the service member was discharged. Harrison further argues that the AFBCMR did not treat the VA's determination as persuasive evidence although the Kurta Memorandum required such deference. And, he contends that the advisory opinions of Dr. Carson, Dr. Chernyak, and Dr. Do are "flawed and inadequate" for various reasons, including that they did not provide a recommendation, applied an incorrect standard of proof, ignored significant evidence, or were made by unqualified authors, [Dkt. No. 51] at 16, and that the AFBCMR ignored evidence, including the opinions of Dr. Meisler, Dr. Underhill, and Michaels, as well as the full VA examination reports.

Defendant disputes Harrison's assertions and maintains that the AFBCMR complied with the APA because it considered the relevant data and made a rational connection between the facts and its ultimate decision. Defendant argues that the AFBCMR acknowledged the liberal

consideration standard in its written decision but determined that the standard did not warrant

relief, which satisfied its "minimal burden to withstand APA review," and that in any case liberal

consideration does not mandate granting relief. [Dkt. No. 52] at 14.  Defendant maintains that it

was rational for the AFBCMR to agree with the advisory opinions from Dr. Carson, Dr.

Chernyak, and Dr. Do because they were "based on contemporaneous medical records from

[p]laintiff's time of service" and the issue before the AFBCMR was fitness for service at the time

of retirement, whereas Dr. Johnson's and Dr. Cooper's opinions were based on evidence from

decades later.  [Dkt. No. 47] at 19.  Defendant argues that the AFBCMR's consideration of the

VA's determination was not erroneous, and that the advisory opinions provided by Dr. Carson,

Dr. Chernyak, and Dr. Do satisfied the APA's substantial evidence standard.

The Court agrees with Harrison that the AFBCMR's decision on his application was

arbitrary and capricious and unsupported by substantial evidence.  Harrison presented a

significant amount of evidence, including diagnoses from Dr. Johnson, Dr. Cooper, and VA

physicians, showing that he suffers from chronic PTSD and that his PTSD was the result of the

1976 plane crash and/or his service in Vietnam.  Harrison also provided evidence showing that

he was experiencing PTSD symptoms in 1978 such that he was unfit for service.  Dr. Cooper,

who had treated Harrison since 2009, met with him 126 times, and also spoke with his wife,

reported that Harrison has been suffering from PTSD since the plane crash and provided a long

list of psychiatric symptoms that he displayed at the time of discharge.  Dr. Johnson also

expressed that based on the horrific trauma that Harrison experienced in the 1976 plane crash, he

was more likely than not suffering from PTSD symptoms that were unfitting for duty in 1978.

Despite this evidence, the AFBCMR and the Air Force's medical advisors recommended

against relief, and in doing so, they placed significant weight on clinical evidence from

Harrison's period of service and the absence of a contemporaneous record of PTSD symptoms, discounting the more recent opinions of Harrison's physicians and treatment providers. There are several problems with the AFBCMR's analysis. First, the AFBCMR and medical advisors emphasized their focus on the "snapshot in time" and Harrison's medical records from 1978, a practice that runs counter to the Hagel, Carson, and Kurta Memoranda and the mandate of liberal consideration. See Doyon v. United States, 58 F.4th 1235, 1243-44 (Fed. Cir. 2023) (holding that the Kurta Memorandum applies to "any petition seeking discharge relief," which includes requests to change the "narrative reason for discharge"). Defendant responds that the AFBCMR sufficiently applied the liberal consideration standard, pointing out that the written decision discussed the Hagel and Kurta Memoranda in its section on "Applicable Authority," AR 13, and the "Findings and Conclusion" section stated that the AFBCMR was "satisfied that the application of liberal consideration does not warrant relief," AR 20. But merely acknowledging and reciting the liberal consideration standard and including a conclusory statement about being "satisfied" does not show reasoned decision making or a reasonable application of that standard, particularly where the substance and reasoning of the AFBCMR's decision belie any such claim.

The driving force behind the Hagel, Carson, and Kurta Memoranda was the recognition that PTSD was not recognized as a diagnosis in 1978 and that mental health conditions were not well understood and were underreported in the military during the period of service for Vietnam veterans like Harrison. Accordingly, the memoranda make clear that liberal consideration is required because records at the time of discharge often lack substantive information about mental health conditions for such "invisible wounds." AR 243. In particular, the Kurta Memorandum explains that it is "unreasonable" to expect the same level of proof for mental health conditions like PTSD, because such conditions were "far less understood" at the time of service than they

31

are today, and that boards should not "condition relief on the existence of evidence that would be unreasonable or unlikely under the specific circumstances of the case." AR 246-47.

By focusing on the lack of evidence of mental health symptoms in Harrison's service records and requiring record evidence of PTSD from the time of service, the AFBCMR and the Air Force medical advisors have done exactly what the Hagel and Kurta Memoranda counseled against and sought to remedy. All of the physicians and treatment providers who presented opinions on Harrison's case—including Air Force advisors Dr. Carson and Dr. Do—agree or do not dispute that the 1976 plane crash likely had a psychological impact on him. As Dr. Cooper explained based on her extensive work with Harrison, he was "unequivocally" suffering from PTSD since the plane crash. AR 269. Dr. Meisler reported that Harrison's medical records "document a long history of PTSD symptoms." AR 145. Yet evidence in the administrative record also shows that Harrison likely suppressed his symptoms during his service. Dr. Johnson explained that PTSD symptoms can be hidden, it "would not be uncommon" in the military at the time for Harrison not to have displayed overt symptoms, and, in any case, there was "no procedure or theory within psychiatry" that would have revealed the symptoms of PTSD in 1978. AR 602. As Dr. Meisler opined in his 2003 examination, Harrison had sought treatment for depression in 1996 but had "refused to address or discuss issues related to his trauma history due to severe avoidance." AR 145. Even the Air Force's medical advisor, Dr. Carson, recognized the "negative stigma associated with mental health care at the time" and the "possibility of downplaying [non-reporting] of symptoms by the patient," AR 250, which Dr. Do also noted, AR 272. It was therefore unreasonable and contrary to the Department of Defense's guidance for the AFBCMR and the Air Force's medical advisors to require "symptoms observed or disclosed" at the time of service. Id.

Defendant argues that it was rational for the AFBCMR to agree with the Air Force's advisory opinions based on contemporaneous medical records and decline to follow the opinions submitted by Harrison that were based on "evidence from decades after the relevant period," because the "salient issue is whether [p]laintiff had PTSD rendering him unfit for service and warranting a 100 percent disability rating at the time of his medical retirement[.]" [Dkt. No. 47] at 19 (emphasis in original); [Dkt. No. 52] at 13. Defendant is correct that the issue before the AFBCMR was whether there was an error or injustice in the Air Force's determination that Harrison was "unfit to perform the duties" of his rank and the corresponding percentage of disability at the time of retirement, 10 U.S.C. § 1201(a); Air Force Manual 35-4, ¶ 3-26; however, defendant conflates the fitness inquiry, which looks to the time of service, with sources of evidence that are relevant to that inquiry. As discussed, the Department of Defense has instructed the boards for correction of military records to consider evidence outside of the service period and, pursuant to the Kurta Memorandum, contemporaneous evidence is not required and is an unreasonable requirement in cases like Harrison's involving PTSD.

In this case, it is also significant that no psychiatric or psychological evaluation was performed in 1978, which is itself an error and injustice. In 1978, both Dr. Shepler and Dr. Peterson recognized the need for Harrison to receive a mental health evaluation before returning to duty, writing in their reports that Harrison was capable of flying an aircraft, "providing that his psychological status would warrant this," AR 103, and "after a thorough psychiatric evaluation[] to evaluate his reaction to the accident," AR 105. These statements make clear that a psychiatric or psychological evaluation was a precondition to determining his fitness to fly, but Harrison never received such an evaluation. Defendant and Dr. Do minimize these statements by arguing that these recommendations "pertained to his ability to fly, which would have been relevant only

33

if the Air Force found he was medically retainable in the first place—which it did not do." [Dkt. No. 47] at 25-26 n.11; see AR 272-73 (opinion of Dr. Do) (explaining that a psychological assessment was "not necessary" because it was a precondition to returning to fly and Harrison was found to be not medically retainable). Dr. Do further asserted that a psychological assessment was "not warranted nor performed" because Harrison "made no complaints of any mental health symptoms." AR 273. Dr. Do's conclusion is unfair because, as discussed, mental health issues were underreported and stigmatized in the military and a service member like Harrison would likely downplay or avoid discussing mental health symptoms.

The lack of understanding of mental health issues like PTSD may explain why the Air Force did not perform a psychological or psychiatric assessment in 1978, but that does not render such an assessment irrelevant or unnecessary. Because a psychological or psychiatric assessment was a precondition to returning to fly according to Dr. Shepler and Dr. Peterson, it was therefore also relevant to determining Harrison's fitness to perform his duties as a pilot under 10 U.S.C. § 1201. The Air Force Manual in effect at the time of Harrison's service recognized that a physical disability could include "mental disease" and provided that "the aggregate effect of all defects present must be considered . . . from the standpoint of the effect on the member's performance" in determining fitness. Air Force Manual 35-4, ¶¶ 3-26(c)-(d). And once a service member was determined to be unfit and eligible for disability benefits, "the percentages of all listed compensable defects" were to be combined to determine the combined percentage on which retirement pay is based. Id. ¶ 3-34(e). The psychological impact of a horrific military plane crash that would make a pilot unfit to fly would no doubt be encompassed in the definition of a "disability" and, if determined to be unfitting, should have been included in calculating Harrison's disability rating given the requirement to include "all defects."

In sum, a psychological or psychiatric assessment was relevant to ensuring that Harrison's fitness to be a pilot was properly evaluated, even if he was found to be physically incapable of flying, and it was also necessary to ensuring that his disability rating accurately reflected both the physical and mental conditions which rendered him unfit for continued military service. The Physical Evaluation Board's failure to consider Harrison's mental health and evaluate the psychological impact of the 1976 plane crash on him, which might have uncovered specific psychiatric symptoms of PTSD, was a material error and injustice. It was therefore unreasonable for the AFBCMR to rely so heavily on the absence of evidence of mental health symptoms in Harrison's record, when it is uncontested that no mental health evaluation was performed, that mental health symptoms were often suppressed or underreported by service members, and that it is the lack of mental health recognition in his records which is "the very error that he seeks to have corrected[.]" Haselwander, 774 F.3d at 993 (finding arbitrary and capricious the Army Board for Correction of Military Records' denial of a service member's request to correct his records to reflect that he was wounded in hostile action because of an absence of a medical record to corroborate external evidence of his wounds, reasoning that "[t]he Board misapprehends its powers and duties as a record correction body when it denies an application because the applicant's records are incomplete").

As Harrison points out, the AFBCMR failed to apply the liberal consideration standard to the evidence supporting his request for a records correction, and as a result, the AFBCMR and its medical advisors did not adequately consider the evidence that he presented. The AFBCMR discounted the opinions of Dr. Johnson and Dr. Carson on the grounds that they were "not proof of the applicant's mental status at the time of his release" and it declined to "usurp or invalidate clinical evidence during the applicant's period of service with clinical opinions based upon

35

symptoms reported, and rating decisions made over four decades later." AR 19. But the Hagel

and Kurta Memoranda explicitly provided that evidence can "come from other sources other than

a veteran's service record," including "records from . . . mental health counseling centers,

hospitals, physicians . . . and statements from family members," AR 244, and Harrison offered

such evidence. Accordingly, because the AFBCMR is directed to give such extrinsic evidence

liberal consideration, it was irrational for the AFBCMR to dispose of that evidence merely

because it did not want to "usurp" contemporaneous records (that were themselves deficient).

See Hassay v. United States, 150 Fed. Cl. 467, 480 (2020) (providing that a medical opinion is

"no less relevant because it is based on [a physician's] treatment of [the applicant] many years

after he left service" and observing that "disorders like PTSD were until recently not well

understood" and accordingly are "often not diagnosed until many years after they manifest

themselves"); Walters v. United States, 358 F.2d 957, 962-63 (Ct. Cl. 1966) (requiring the Board

for Correction of Naval Records to consider "subsequent medical history insofar as it sheds light

on the nature of [the applicant's] physical condition while in service" and that "[e]vidence of

progressive deterioration and later discovered symptoms and disabilities may be decisive if it can

establish that [the applicant's] incapacity while in service was substantially more serious than

suspected and that previous diagnoses were inadequate or incorrect"). Moreover, the AFBCMR

does not appear to have considered Dr. Cooper's assessment that based on nine years of

counseling and 126 sessions, Harrison was displaying or suffering from psychiatric symptoms at

the time of service, or the "long history" of PTSD symptoms mentioned by Dr. Meisler.

Dr. Do characterized Dr. Johnson and Dr. Cooper's assessments as "purely speculative

and not confirming" because they were based on evaluations conducted nearly 40 years after the

plane crash. AR 272. Not only does this characterization run contrary to the Kurta

Memorandum, it is also unfair to call the opinions "speculative" when they were based on treatment sessions and direct examinations of Harrison. Neither Dr. Do nor any of the other Air Force medical advisors evaluated Harrison in person to ask him about his psychiatric symptoms at the time of service, and the AFBCMR also declined to hold a hearing on the grounds that it would not "materially add to the Board's understanding of the issues involved." AR 20.

The Court also agrees with Harrison that Dr. Chernyak's advisory opinion was wholly inadequate. Dr. Chernyak was called upon to provide the advisory opinion of a clinical psychologist or psychiatrist pursuant to 10 U.S.C. § 1552(g) because Harrison's application related to a mental health disorder, and Dr. Carson specifically referenced that such an opinion was required. See AR 250. Rather than providing her own independent evaluation of Harrison's application, Dr. Chernyak parroted that she "concurs" with Dr. Carson and "recommends denial." AR 253. Because Dr. Carson is not a clinical psychologist or psychiatrist, Dr. Chernyak's opinion lacked any meaningful insight from a mental health specialist.

Finally, the Kurta Memorandum directed the AFBCMR to treat the VA's determination as "persuasive evidence that the condition existed . . . during military service," AR 245, but there is no indication that the AFBCMR complied with this guidance other than stating that the VA's disability rating for PTSD is "not proof that the ratings underlying these actions are reflective of the applicant's actual functionality" in 1978, AR 19. This statement is insufficient and does not show a reasoned consideration for rejecting the VA's determination as persuasive evidence. Although defendant properly recognizes that the VA plays a different role in the military disability system than the military departments, that distinction does not satisfy the "persuasive evidence" requirement. Acting Under Secretary Kurta was no doubt aware of that distinction because he indicated that the VA's determination is not binding on the Department of Defense,

yet he nonetheless provided that the VA's determination is "persuasive evidence" that the condition existed during military service, which invariably includes the extent to which the service member was suffering from the condition.

In sum, the AFBCMR's September 2019 decision that there was no error or injustice warranting a change in Harrison's disability rating based on his PTSD was arbitrary, capricious, and unsupported by substantial evidence. Accordingly, the September 2019 decision is vacated and has been remanded to the AFBCMR for reconsideration of Harrison's claims that his record should include a diagnosis of PTSD and that his disability rating should be increased to a higher percentage based on his PTSD retroactive to 1978. In conducting this review, the AFBCMR should properly apply the liberal consideration standard, appropriately consider Harrison's contemporaneous service records in light of the Hagel and Kurta Memoranda and the Air Force's failure to have Harrison receive a psychiatric or psychological evaluation in 1978, and evaluate and consider the abundance of evidence showing that Harrison suffered from PTSD at the time of his military service and that his mental illness also contributed to his unfitness.

IV. CONCLUSION

For the reasons stated above and in accordance with the Amended Order to be issued with this Memorandum Opinion, Plaintiff's Motion for Summary Judgment [Dkt. No. 43] has been granted and Defendant's Motion to Dismiss, or in the Alternative, for Summary Judgment [Dkt. No. 46] has been denied.

Entered this 20 day of April, 2023.

/s/

Leonie M. Brinkema
United States District Judge

Alexandria, Virginia

38